UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**EDGAR JONES, JR.**,                                  Case Number:  1:13 CV 417

     Plaintiff,

                                Magistrate Judge James R. Knepp, II

     v.

**COMMISSIONER OF SOCIAL SECURITY**,

     Defendant.                                  MEMORANDUM OPINION AND ORDER


### INTRODUCTION

Plaintiff Edgar Jones, Jr., seeks judicial review of Defendant Commissioner of Social Security's decision to deny supplemental security income ("SSI"). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). The parties have consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 15). For the reasons given below, the Court affirms the Commissioner's decision denying benefits.

### PROCEDURAL BACKGROUND

Plaintiff filed an application for SSI on August 19, 2009, alleging disability since June 26, 2008, due to anxiety attacks, depression, right knee problems, a 1983 brain injury from a gunshot wound, and lower back and left foot injuries. (Tr. 10, 111, 127). His claim was denied initially and on reconsideration. (Tr. 61, 70). Plaintiff requested a hearing before an administrative law judge ("ALJ"). (Tr. 77). At the hearing, Plaintiff, represented by counsel, and a vocational expert ("VE") testified. (Tr. 28). On September 22, 2011, the ALJ concluded

Plaintiff was not disabled. (Tr. 7). Plaintiff's request for review was denied, making the decision of the ALJ the final decision of the Commissioner. (Tr. 1); 20 C.F.R. §§ 416.1455, 1481. On February 27, 2013, Plaintiff filed the instant case. (Doc. 1).

## FACTUAL BACKGROUND

### *Plaintiff's Background, Vocational Experience, and Daily Activities*

Plaintiff was 44 years old on the date he filed his application for SSI. (Tr. 20). He has a high school education and past relevant work experience as a laborer. (Tr. 20).

Plaintiff lived in an apartment with a friend. (Tr. 145). Concerning daily activities, Plaintiff maintained personal care, prepared simple meals or walked to a food bank, cleaned the bathroom, washed clothes, rode a bicycle, used public transportation, and shopped for food and clothes. (Tr. 147-48, 168-71, 190). Plaintiff did not have difficulty paying bills, counting change, handling a savings account, or using a checkbook and enjoyed watching television and playing cards or board games. (Tr. 149, 192). He regularly went to church or a community center for food and clothing and would sometimes watch movies there, although he did not like to be around a lot of people. (Tr. 149, 172-73). Plaintiff said he did not get along well with authority figures. (Tr. 150, 193).

### *Medical Evidence*

Plaintiff was assaulted with a pistol on June 27, 2008, from which he suffered a liver laceration, nasal fracture, and rib fracture. (Tr. 242, 275). One month after the incident, Plaintiff complained of blurry vision. (Tr. 260). A CT scan of Plaintiff's face revealed anterior nasal spine fracture of indeterminate age and soft tissue swelling in the periorbital region. (Tr. 260). A CT scan of Plaintiff's head revealed no acute intracranial injury, a remote gunshot wound to the

2

occiput with adjacent encephalomalacia, and facial soft tissue swelling. (Tr. 291). Plaintiff had

no fracture or subluxation of the cervical or upper thoracic spine. (Tr. 294).

On August 8, 2008, Plaintiff saw Gaby S. El-Khoury, M.D., for a general checkup. (Tr.

254). Plaintiff's high blood pressure had persisted for the past two months and he tested positive

for cocaine use. (Tr. 254). Plaintiff explained he did not use cocaine but that "someone must

have added cocaine to his joint". (Tr. 254). Earlier in the summer, Plaintiff underwent a

epigastric hernia repair, which he tolerated well. (Tr. 254, 258, 264, 270). Plaintiff's physical

examination was generally unremarkable and he was advised to stop smoking, avoid drugs, limit

beer consumption, and follow up in one month. (Tr. 255-57).

On September 21, 2008, Plaintiff presented to Joseph Labastille, M.D., for treatment of

newly diagnosed hypertension, complaints of headache and vision trouble, and seeking a referral

for treatment of depression. (Tr. 251). Dr. Labastille diagnosed hypertension, headache, and

depressive disorder; prescribed medication; and referred Plaintiff to behavioral medicine. (Tr.

252).

Plaintiff continued to treat with Dr. Labastille every three-to-six months. (Tr. 227, 249,

251, 347, 418, 439, 457, 474, 493, 499). Although Plaintiff consistently complained of

hypertension and joint pain (Tr. 249, 457, 474), he generally indicated he was doing "well" or

"fair to good" (Tr. 227, 249, 418, 499). Further, Plaintiff's medication regimen was consistently

well-tolerated and without side effects. (Tr. 227, 249, 499).

On December 10, 2008, Anthony E. Boyd, LISW, performed a community health

assessment at Behavioral Health Counseling and Therapy. (Tr. 242). There, Plaintiff's chief

complaint was, "[d]epression and I got a problem where I feel I might wanna hurt somebody".

(Tr. 242). Plaintiff's symptoms included depressed mood, anger, anxiety, feelings of isolation,

3

auditory hallucinations, restlessness, paranoia, poor concentration/inability to focus, sleep disturbance, and poor appetite. (Tr. 242). He had a history of drug abuse and said he could only afford to drink a six-pack of 24-ounce beers every few days. (Tr. 243). Mr. Boyd noted Plaintiff had visible pain and said he was not looking for work primarily due to a felony record. (Tr. 244). Previously, Plaintiff was incarcerated for eleven-and-one-half years. (Tr. 244). Plaintiff's mental status examination was generally unremarkable aside from a mood that was depressed, irritable, anxious, angry, frustrated, "empty", and "sad" and an affect that was constricted, flat, and dull. (Tr. 245). Mr. Boyd assessed depressive disorder with psychotic features and assigned a global assessment of functioning ("GAF") score of 41-50.[1] (Tr. 246).

Plaintiff had counseling sessions with Mr. Boyd in January 2009, February 2009, March 2009, April 2009, August 2009, and September 2009. (Tr. 225-40). Throughout this time, Plaintiff's mental status examinations were generally unremarkable aside from an occasional depressed, excitable, or irritable mood. (Tr. 225-26, 229-37, 239-40). He consistently tolerated counseling well and was diagnosed with depressive psychosis. (*Id*.). At times, Plaintiff complained of increased symptoms, usually when he was off medication. (Tr. 229, 239). However, when he took his medication as prescribed, Plaintiff said he felt good. (Tr. 231, 235). Intermittently, Plaintiff attributed depression to his failure to secure employment on account of a lengthy felony record. (Tr. 233, 235).

---

1. The GAF scale represents a "clinician's judgment" of an individual's symptom severity or level of functioning.  American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32–33 (4th ed., Text Rev. 2000) (*DSM-IV-TR*). A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR moderate difficulty in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id*. at 34.

4

On January 29, 2009, Plaintiff had a pharmacological management appointment with Angela Gannon, M.D. (Tr. 237). There, Plaintiff said he stopped taking Abilify because it made him feel restless and he could not sleep. (Tr. 237). Plaintiff heard "some" voices and indicated his daily functioning suffered due to depression and trouble concentrating. (Tr. 237). Plaintiff also complained of vague aches and pains persisting for the past two weeks. (Tr. 237). Dr. Gannon diagnosed depressive psychosis. (Tr. 238).

On January 17, 2010, Plaintiff said he fell and injured his shoulder several months earlier but did not go to the emergency department because he did not have medical coverage. (Tr. 347). After x-rays revealed 3rd degree AC separation with some irregularity of the distal clavicle, Plaintiff was referred to orthopedics. (Tr. 349, 354).

Plaintiff returned for individual counseling with Mr. Boyd on February 3, 2010, requesting samples of medication because he could not afford to fill his prescriptions. (Tr. 345). Plaintiff said he recently went to jail along with his girlfriend for a domestic incident. (Tr. 345). Plaintiff's mental status examination was unremarkable and he had good control of his target symptoms. (Tr. 346).

On March 1, 2010, Plaintiff sought treatment for his right shoulder. (Tr. 343). He was diagnosed with probable grade II AC sprain, although there was not 100% displacement of the right distal clavicle. (Tr. 343). The required treatment was non-surgical and Plaintiff was advised to go to physical therapy and take NSAIDs for pain management. (Tr. 343). Also around this time, Plaintiff was prescribed eye-glasses. (Tr. 340, 484).

On March 10, 2010, Plaintiff saw Mr. Boyd and expressed concerns about the recent denial of benefits and being unable to afford medication. (Tr. 338). Plaintiff said financial strife

inflicted a great deal of stress and he was no longer able to complete odd jobs for money. (Tr. 338). Plaintiff's mental status examination was unremarkable and Dr. Boyd gave him a letter in support of his appeal for benefits and advised Plaintiff to continue supportive counseling. (Tr. 338-39).

On March 13, 2010, while off medication, Plaintiff complained to Dr. Labastille of headaches, increased knee pain, and high blood pressure. (Tr. 474-75).

Plaintiff saw Michael J. Seidman, M.D., at a follow-up visit on April 18, 2010 regarding blood pressure. (Tr. 482). Plaintiff also said he could not sleep on his right side due to shoulder pain and could not attend physical therapy due to financial and transportation difficulties. (Tr. 482).

On June 18, 2010, Plaintiff was referred to Sheila Chiu-Miller, M.D., to address back, knee, and toe pain. (Tr. 469). Plaintiff denied depression, and claimed he could stand, sit, or walk for a maximum of five minutes and had trouble with his sex life. (Tr. 469). Following a largely unremarkable physical examination and review of x-rays, Dr. Chiu-Miller concluded there was no vertebral body fracture or subluxation. (Tr. 471). Plaintiff was assessed with lumbar spondylosis and osteoarthritis bilateral of the knees. (Tr. 471).

Plaintiff saw Christopher Wyatt, M.D., on November 4, 2010 at the emergency room for complaints of chronic left knee pain presenting with acute exacerbation. (Tr. 460). Plaintiff said he suffered from left knee pain "since birth", but the pain had recently increased. (Tr. 460). After a generally unremarkable physical examination, Plaintiff was assessed with osteoarthritis in the left knee with joint effusion, prescribed Motrin/Percocet, and advised to follow up with an orthopedist. (Tr. 461-62).

6

On November 17, 2010, Plaintiff presented to Anna Wallace, M.D., for an initial orthopedic visit. (Tr. 453). Plaintiff complained of long-standing bilateral knee pain but said he had an acute increase in left knee pain over the last two weeks and used a cane occasionally. (Tr. 453). Plaintiff's physical examination was generally unremarkable and he had no recent trauma but said there was a specific location near the medial tibia that was very sore to the touch. (Tr. 453-55). Imaging showed degenerative changes and evidence of Osgood-Schlatter disease then Plaintiff was referred for physical therapy and given a prescription for Naprosyn. (Tr. 455).

Plaintiff underwent a diagnostic assessment with Jyoti Aneja, M.D.,[2] on November 19, 2010. (Tr. 408). When pressed, Plaintiff admitted he was not compliant with his medication regimen and Dr. Aneja indicated Plaintiff's visits were focused on establishing a mental health record and applying for SSI. (Tr. 409). Plaintiff recounted his criminal and violent history without observed remorse. (Tr. 409). He complained of pain "all over" and said he was terminated from his last job because he was imprisoned. (Tr. 410). Plaintiff's mental status examination was unremarkable aside from a calm but intimidating appearance and tight association. (Tr. 411). Plaintiff's barrier to learning was listed as "[m]otivation", he was assigned a GAF of 65-75,[3] and his current medication regimen was continued. (Tr. 412).

---

2. Dr. Aneja's name is spelled no less than three different ways in the record (i.e., "Aneja" (Tr. 408), "Aveja" (Tr. 18), and "Areya" (Tr. 491)). Based on a type-written note (Tr. 408), the Court will use the first-listed spelling.

3. A GAF score of 61-70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." *DSM-IV-TR*, at 34. A GAF score of 71-80 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g., difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork)." *Id*.

Plaintiff began physical therapy on November 30, 2010, where he said he used a cane, a brace made the pain worse, and he had difficulty getting his left shoe off, dressing, lifting, and carrying. (Tr. 448). Plaintiff underwent a physical examination and was provided with a home exercise program. (Tr. 451). He returned for physical therapy on December 8, 2010, which he tolerated well without complaints of increased pain post-session and with decreased pain after some exercises. (Tr. 446-47).

On December 10, 2010, an x-ray of Plaintiff's left knee revealed interval development of moderate joint effusion in the suprapatellar space, nonunion medial tibial tubercle, and mild degenerative changes. (Tr. 434). At physical therapy, Plaintiff said he walked a mile and a half with his dogs the day before which caused increased pain at the time of the visit. (Tr. 434). Plaintiff tolerated treatment well and had no complaints post-visit. (Tr. 435). He was to continue his home exercise plan as tolerated. (Tr. 435).

On December 18, 2010, Plaintiff followed up with Dr. Labastille where he reported difficulty seeing and requested a prescription for Cialis. (Tr. 439). Dr. Labastille assessed Plaintiff with hypertension (under good control), organic impotence, and a visual impairment; directed Plaintiff to continue his medication regimen; provided an ophthalmology referral; and prescribed Cialis. (Tr. 440-41).

On January 14, 2011, Plaintiff met with Kristen Liviskie, LISW-S, for an initial individual counseling session. (Tr. 402). Plaintiff described his current stressors relating to his daughter and struggling to make ends meet financially. (Tr. 402). Plaintiff reported a history of anger problems but expressed desire to positively contribute to society. (Tr. 402). Plaintiff's

mental status examination was generally unremarkable aside from guarded behavior; tight association; attention seeking behavior; fair to poor insight; angry, irritable mood; and flat-inappropriate affect. (Tr. 403).

At the same time, Plaintiff had a pharmacological management appointment with Dr. Aneja. (Tr. 405). Plaintiff did chores for his landlord in exchange for rent and expressed anger toward his welfare case manager and society in general because he did not receive the help he was entitled. (Tr. 406). He requested samples of medication and had a normal mental status examination. (Tr. 406). Dr. Aneja indicated Plaintiff was not benefiting from medication, especially with noncompliance, and may benefit from more counseling. (Tr. 406).

On January 19, 2011, Plaintiff had a second physical therapy appointment to address left knee pain. (Tr. 427). He said the pain was unchanged since the initial visit. (Tr. 428). Little progress had been made and Plaintiff's compliance with a home exercise program was questioned. (Tr. 428). Plaintiff's subjective reports were inconsistent with objective observations and measurements; therefore, he was discontinued from physical therapy. (Tr. 428).

On February 23, 2011, Plaintiff had individual counseling with Ms. Liviskie where he indicated he did not want to stay long because he was not feeling well and indicated he was not getting along with his daughter. (Tr. 399). Plaintiff was not in pain and his mental status exam was generally unremarkable aside from agitated, guarded behavior; tight association; and constricted affect. (Tr. 400).

Plaintiff treated with Dr. Aneja on March 11, 2011, for pharmacological management. (Tr. 396). Plaintiff reported problems with his daughter, who lived with him but did not pay bills,

and said he was doing "OK". (Tr. 396). Plaintiff expressed discomfort with anyone standing behind him and his mental status examination was generally unremarkable aside from poor judgment and insight. (Tr. 396).

In Spring 2011, Plaintiff said an intra-articular injection of steroids, NSAIDs, and physical therapy did not improve knee pain, which worsened when climbing stairs. (Tr. 418, 424-26, 508).

On May 29, 2011, Dr. Labastille indicated Plaintiff was feeling well but complained of intermittent tingling over his right forearm. (Tr. 499). The prescription drug Maxzide was discontinued due to renal failure, but all other medications were continued. (Tr. 500). X-rays of Plaintiff's cervical spine were unremarkable. (Tr. 502).

On July 21, 2011, Dr. Aneja completed a psychological questionnaire where she indicated Plaintiff suffered from impulse control disorder and antisocial personality disorder. (Tr. 491). Plaintiff's symptoms improved with medication and included anger, irritability, and poor impulse control. (Tr. 491). Dr. Aneja averred Plaintiff had some medication compliance issues and although he continued to make progress, Dr. Aneja said it was unlikely he could sustain a normal work-week. (Tr. 491). Dr. Aneja indicated Plaintiff's ability to get along with others was very poor, as was his ability to respond appropriately to work pressures in a usual work setting. (Tr. 492).

Dr. Labastille completed a pain questionnaire on August 8, 2011, where he said Plaintiff suffered from hypertension, depressive disorder, chronic pain in multiple sites, and esophageal reflux. (Tr. 493). Dr. Labastille indicated NSAID, knee injections, and physical therapy did not

relieve Plaintiff's "almost daily" joint pain. (Tr. 493). According to Dr. Labastille, Plaintiff would be able to sit for three-to-four hours without interruption, stand or walk for three hours without interruption, and could lift twenty pounds occasionally. (Tr. 493-94). Plaintiff required a fifteen minute break every two-to-three hours and due to pain, would be expected to miss four-to-five days monthly. (Tr. 494). Plaintiff had difficulty with repetitive movements, bending, and squatting and would not be a good candidate to work on an assembly line. (Tr. 494). At a subsequent treatment visit, Dr. Labastille stated Plaintiff was doing "well" and tolerating his current medication regimen without side-effects. (Tr. 495).

***State Agency Review***

On October 2, 2009, state agency medical consultant Karen Steiger, Ph.D., completed a mental residual functioning capacity ("RFC") assessment and psychiatric review technique. (Tr. 300, 304). She reviewed Plaintiff's medical records and concluded he was either not significantly limited or moderately limited in all areas of mental functioning. (Tr. 300-01). Dr. Steiger determined Plaintiff was capable of performing moderately complex tasks with minimal and superficial social interaction. (Tr. 302). Further, she concluded Plaintiff suffered from depressive disorder with psychotic features, post-traumatic stress disorder and personality disorder, which would mildly limit his activities of daily living and moderately limit Plaintiff's abilities to maintain social functioning, concentration, persistence, or pace. (Tr. 307-14). Jennifer Swain, Psy.D., affirmed Dr. Steiger's findings as written on July 16, 2010. (Tr. 393).

After Plaintiff failed to appear at the first scheduled appointment, Eulogio R. Sioson, M.D., examined Plaintiff on November 11, 2009. (Tr. 318-19). There, Plaintiff complained of back and joint pain, in part due to a childhood knee disorder, a truck accident in 1989, and a left foot fusion in 1997 after he was stepped on by a cow while in prison. (Tr. 319). Plaintiff arrived

11

at the appointment by bus and used a non-prescribed cane and orthopedic shoes. (Tr. 319). Plaintiff said he did not do any household chores aside from microwaving meals and was able to maintain personal care. (Tr. 319). Plaintiff complained of daily headaches, lightheadedness, and periodic loss of consciousness. (Tr. 319). Concerning mental problems, Plaintiff said he was depressed, suffered from auditory hallucinations, had poor sleep, fair appetite, low energy, hopelessness, and memory and concentration problems. (Tr. 319).

On physical examination, Plaintiff walked with a slight limp and declined to do heel/toe walking or squats due to pain. (Tr. 320). Plaintiff was able to get up and down from the examination table and his physical examination was generally unremarkable aside from pain in the right fifth phalanx, marked lower back tenderness, and pain during straight leg raise testing. (Tr. 320). Dr. Sioson concluded Plaintiff was limited to sedentary activity due to pain on range of motion testing. (Tr. 320).

On January 2, 2010, Michael Stock, M.D., reviewed Plaintiff's records and concluded Plaintiff had the physical RFC to lift or carry twenty pounds occasionally and ten pounds frequently, stand or walk with normal breaks for at least two hours in an eight-hour workday, sit for about six hours in an eight-hour workday, and could push or pull without limitation. (Tr. 326-27). Further, Plaintiff could occasionally climb, stoop, kneel, crouch, and crawl. (Tr. 328). On July 22, 2010, W. Jerry McCloud, M.D., affirmed Dr. Stock's findings as written. (Tr. 394).

***ALJ Decision***

The ALJ determined Plaintiff suffered from severe impairments including osteoarthritis of the right shoulder, osteoarthritis of the knees bilaterally, osteoarthritis of the left foot, lumbar spondylosis, affective disorder, anti-social personality disorder, and a history of polysubstance abuse. (Tr. 12).

12

Next, the ALJ determined Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment. (Tr. 13). The ALJ found Plaintiff had the RFC to perform a range of sedentary work except he was limited to occasionally using a ramp or stairs; never using ladders, ropes, or scaffolds; frequently balancing; occasionally stooping, kneeling, and crouching; never crawling; no lifting overhead but he could lift parallel to the ground and below; frequently handling, fingering, and feeling; avoiding high concentrations of noise, smoke, fumes, dust, and pollutants; avoiding unprotected heights; avoiding complex tasks but he could do simple and routine tasks; only low-stress work and no high-production quotas or piece work; no work involving arbitration, confrontation, or negotiation; no supervision; and superficial, interpersonal interactions with the public and co-workers. (Tr. 15).

Considering Plaintiff's age, education, work experience, RFC, and VE testimony, the ALJ determined Plaintiff could work as a charge account clerk, addresser, and food and beverage order clerk. (Tr. 20-21). Thus, the ALJ determined Plaintiff was not disabled. (Tr. 21).

### STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial

evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for SSI is predicated on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. § 404.1520 – to determine if a claimant is disabled:

1. Was the claimant engaged in a substantial gainful activity?

2. Did the claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's RFC and can he perform past relevant work?

5. Can the claimant do any other work considering his RFC, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in steps one through four. *Walters*, 127 F.3d at 529. The burden then shifts to the Commissioner at step five to establish whether the claimant has the RFC to perform available work in the national economy. *Id.* The court considers the claimant's RFC, age, education, and past work experience to determine if the claimant could perform other work. *Id.* A claimant is only determined to be

disabled if he satisfies each element of the analysis, including inability to do other work, and meets the duration requirements. 20 C.F.R. §§ 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff argues the ALJ improperly evaluated the opinions of Drs. Labastille and Aneja and further argues the ALJ's step five determination is not supported by substantial evidence. (Doc. 17). Each argument is addressed in turn.

### *Treating Physician Rule*

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if it is supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* The ALJ must give "good reasons" for the weight given to a treating physician's opinion. *Id.* A failure to follow this procedural requirement "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Id.* (citing *Rogers*, 486 F.3d at 243). Accordingly, failure to give good reasons requires remand. *Id.* at 409–410.

"Good reasons" are reasons "sufficiently specific to make clear to any subsequent

15

reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96-2p, 1996 WL 374188, at *4). "Good reasons" are required even when the conclusion of the ALJ may be justified based on the record as a whole. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). "If the ALJ does not accord the opinion of the treating source controlling weight, it must apply certain factors" to assign weight to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.*

Here, Plaintiff initially argues the ALJ erred when evaluating the opinion of Dr. Labastille. (Doc. 17, at 12). In assigning limited weight to Dr. Labastille's opinion, the ALJ wrote:

> I have considered the August 8, 2011 medical source statement authored by Joseph Labastille, doctor of family medicine, who indicated that due to [Plaintiff's] impairments, he is limited to sitting three to four hours without interruption in an eight-hour workday, standing or walking three hours without interruption in an eight-hour workday, lifting 20 pounds occasionally and would likely miss four to five days monthly due to pain. [Tr. 493-94]. Dr. Labastille indicated [Plaintiff] has joint pain daily with failed medication, steroid injection and physical therapy treatment. I give limited weight to Dr. Labastille's assessment for several reasons. First, the clinical findings of record reflect mild to moderate osteoarthritis of the knees and right shoulder that is inconsistent with the level of pain [Plaintiff] has complained of at times. Second, [Plaintiff] has an inconsistent course of treatment and subjective complaints that have been identified as inconsistent with objective observations from medical providers. Third, [Plaintiff's] orthopedic impairments have received only conservative treatment and no medical provider has indicated his pain is unmanageable.

16

(Tr. 19) (internal citations omitted). Simply stated, the ALJ considered several regulatory factors in affording limited weight to Dr. Labastille's opinion.

To this end, the ALJ indicated Dr. Labastille was a doctor of family medicine, thereby commenting on the specialization of the treating source. Next, the ALJ pointed out parts of Dr. Labastille's opinion were inconsistent with the record as a whole, including Plaintiff's course of treatment and clinical findings. Moreover, the ALJ found Dr. Labastille's opinion internally unsupported because it was based in part on Plaintiff's inconsistent subjective complaints. Certainly, the ALJ satisfied the good reasons and treating physician rule in affording less than full weight to Dr. Labastille's opinion. *Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011) (noting the "good reasons" rule does not require an "exhaustive factor-by-factor analysis").

Next, Plaintiff argues the ALJ erred when evaluating the opinion of Dr. Aneja. (Doc. 17, at 13). Regarding her assessment, the ALJ wrote:

> Dr. A[n]eja authored a July 21, 2011 medical source statement, which indicated that due to [Plaintiff's] longstanding anti-social personality, it would be unlikely he could engage in gainful employment. [Tr. 491-92]. Dr. A[n]eja indicated [Plaintiff] had very poor capacity to get along with others and needed continuous monitoring of behavior. Dr. A[n]eja also indicated [Plaintiff] was not able to work due to needing to be on psychiatric medications to control his behavior. Dr. A[n]eja's opinion that [Plaintiff] cannot engage in gainful work is given little weight as it contrasts greatly with her progress notes that reflect a good response to medications and GAF score reflective of only mild mental health symptoms, at worst. Dr. A[n]eja's medical source statement also fails to address the impact of [Plaintiff's] inconsistent compliance with treatment and his apparent focus on secondary gain in the form of Social Security benefits.

(Tr. 18) (internal citations omitted). Again, the ALJ considered the relevant regulatory factors as part of his decision to afford Dr. Aneja's opinion little weight.

17

Indeed, the ALJ commented on the supportability of Dr. Aneja's opinion with her own treatment notes, specifically those progress notes which reflected a good response to medication and GAF scores reflective of only mild mental health symptoms. These notes do not support an inability to engage in gainful employment. Further, the ALJ indicated Dr. Aneja's opinion did not consider the record a whole, including Plaintiff's inconsistent compliance with treatment and apparent interest in secondary gain through disability benefits. In short, by commenting on the supportability and consistency of Dr. Aneja's opinion, the ALJ did not err under the treating physician rule.

In addition to arguing that the ALJ did not provide good reasons for the weight afforded to the opinions of Drs. Aneja and Labastille, Plaintiff also challenges the sufficiency of the evidence to support the ALJ's decision. (Doc. 17, at 12-14). Particularly, Plaintiff points to treatment notes indicating failed NSAIDs, physical therapy, and left knee injections. (Doc. 17, at 13). Further, Plaintiff directs the Court to evidence that Plaintiff was noted to be argumentative, intimidating, agitated, and antisocial and any inconsistencies in treatment are consistent with antisocial personality disorder. (Doc. 17, at 13-14). However, Plaintiff's argument fails because the issue before the Court is not whether substantial evidence could support a different result, but whether the ALJ's decision is supported by substantial evidence. *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) ("[I]f substantial evidence supports that ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion."). Here, as the Commissioner points out, substantial evidence supports the ALJ's decision. (Doc. 18, at 15-18).

18

First, regarding Dr. Labastille, substantial objective evidence supports the ALJ's treatment of Dr. Labastille's opinion. To this end, several treatment providers documented generally normal physical examination findings. (Tr. 245, 255-57, 320, 454-55, 461-62, 469-71). Further, at physical therapy, a therapist observed Plaintiff's abilities did not support his extreme allegations of pain. (Tr. 428). Plaintiff declined further pain injections (Tr. 417) and treatment records note several instances when Plaintiff was feeling "well" or "fair to good" (Tr. 227, 249, 418, 499). Of importance, Dr. Labastille indicated shortly after he issued his opinion that Plaintiff was doing "well" and tolerating his current medication regimen without side-effects. (Tr. 495). Further, independent examiners reviewed Plaintiff's record but found his impairments did not preclude the ability to perform a range of sedentary work. (Tr. 326, 394). Last, Plaintiff's activities of daily living are inconsistent with his claims of disabling pain. For example, Plaintiff maintained personal care, prepared simple meals or walked to a food bank, cleaned the bathroom, washed clothes, rode a bicycle, used public transportation, shopped for food and clothes, enjoyed watching television and playing board games, and regularly went to church or a community center. (Tr. 147-49, 168-71, 190, 192, 172-73). Further, there is some evidence Plaintiff did chores for his landlord in exchange for rent. (Tr. 406). For these reasons, substantial evidence supports the ALJ's treatment of Dr. Labastille's opinion.

Similarly, substantial evidence supports the ALJ's treatment of Dr. Aneja's opinion. As the ALJ noted, Dr. Aneja's own treatment notes indicated he had only mild to transient symptoms of impaired mental functioning. (Tr. 412); *Oliver v. Comm'r of Soc. Sec.*, 415 F. App'x 681, 684 (6th Cir. 2011) (the Sixth Circuit views GAF scores as "a subjective determination that represents the clinician's judgment of the individual's overall level of

functioning"). Further, she consistently documented unremarkable mental status examinations. (Tr. 396, 406, 411). Dr. Aneja's own treatment notes suspected Plaintiff was really after developing a mental health record for SSI benefits. (Tr. 409). Similarly, other treatment providers questioned Plaintiff's motivation for treatment, suspecting he was at least secondarily after financial gain (Tr. 338, 402, 406). Mr. Boyd and Dr. Liviskie also reported generally unremarkable mental status examinations aside from an occasional depressed, excitable, or irritable mood. (Tr. 225-26, 229-30, 231-32, 233-34, 235-36, 237, 239-40, 338-39, 346, 400, 403). Plaintiff consistently tolerated counseling well and was diagnosed with depressive psychosis. (*Id.*). At times, Plaintiff complained of increased symptoms, usually when he was off medication. (Tr. 229, 239). However, when he took his medication as prescribed, Plaintiff said he felt good. (Tr. 231, 235). Intermittently, Plaintiff attributed depression to his failure to secure employment on account of a lengthy felony record. (Tr. 233, 235). Further, Dr. Sioson noted Plaintiff was not emotionally labile and was able to maintain attention and concentration. (Tr. 320). In addition to those activities listed above, Plaintiff did not have difficulty paying bills, counting change, handling a savings account, or using a checkbook and enjoyed watching television and playing cards or board games. (Tr. 149, 192).

In sum, the ALJ provided good reasons for the weight afforded to the opinions of Drs. Aneja and Labastille and his decision is supported with substantial evidence. Thus, Plaintiff's argument that the ALJ violated the treating physician rule is not well taken.

### *Step Five*

Plaintiff also argues the ALJ erred "when he relied upon vocational expert testimony to find that [Plaintiff] is capable of performing a significant number of jobs." (Doc. 17, at 14). More

specifically, Plaintiff claims the VE testimony established that the identified jobs require more than superficial interaction with co-workers and the public. (Doc. 17, at 14).

To meet his burden at step five, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Educ. & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id.* If an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with the ALJ's assessment of what the claimant "can and cannot do"). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

Plaintiff claims the VE testimony demonstrates "that the jobs identified by [the VE] could not be performed by an individual who is limited to superficial interpersonal interactions with the public and co-workers. (Doc. 17, at 15). However, upon review of the transcript, this argument is without merit. The VE's testimony that each relevant position's temperament is beyond basic interaction is not inconsistent with his opinion that the relevant positions do not require more than superficial interaction.

21

To this end, the VE defined superficial interaction as "no confrontation, or arbitration, or ongoing relationship with the people that you're in contact with your job." (Tr. 52-53). Conversely, the VE opined that a charge account clerk's temperament would be "described as dealing with people beyond giving and receiving instructions requiring the precise attainment of set limits, tolerances or standards." (Tr. 54). The VE continued (before being cut off by Plaintiff's attorney), "[w]hat that means in actuality I'm not sure, but again from what I know about the job there's not a whole lot of - - ". (Tr. 54). The VE opined that based on temperament, the relevant positions go beyond basic interaction, but confirmed each position "doesn't even deal with the public much" and added the addresser and food and beverage order clerk would involve less social interaction than a charge account clerk. (Tr. 54-55).

Plaintiff does not challenge the RFC determination at this juncture, but rather, only claims the VE testimony is inconsistent with the RFC. However, Plaintiff has not explained how temperament fits into the RFC nor has he indicated precisely how the above exchange reveals an inconsistency between the RFC and VE testimony, nor is one readily apparent.

Moreover, at the hearing, the ALJ asked the VE a hypothetical question which fairly included all of Plaintiff's limitations, including no work involving arbitration, negotiation, or confrontation or supervision and work with only superficial, interpersonal interactions with public and coworkers. (Tr. 50-51). In response, the VE opined Plaintiff could work as a charge account clerk, addresser, or food and beverage order clerk. (Tr. 51-52). Even setting aside the possibly more socially involved position of charge account clerk, Plaintiff does not argue that the remaining two positions would leave the decision unsupported by substantial evidence.

In short, because the relevant testimony is not necessarily contradictory, Plaintiff's argument is without merit. The Court finds the ALJ's step five finding is supported by substantial evidence and affirmed.

### CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying SSI benefits applied the correct legal standards and is supported by substantial evidence. Therefore, the decision of the Commissioner is affirmed.

IT IS SO ORDERED.

 s/James R. Knepp II
United States Magistrate Judge